IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID SATTAZAHN | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| JOHN E. WETZEL, ET AL. | : | NO. 17-3240 |

**MEMORANDUM**

**Padova, J.**                                                              **June 3, 2021**

Before the Court is David Sattazahn's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. United States Magistrate Judge Lynne A. Sitarski has filed a Report and Recommendation that recommends denying the Petition in its entirety. Judge Sitarski also issued an Order denying Sattazahn's request for discovery. Sattazahn has filed Objections to the Report and Recommendation and Judge Sitarski's denial of discovery. For the reasons that follow, we overrule Sattazahn's Objections, adopt the Report and Recommendation in all material respects, and deny the Petition.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On January 22, 1999, Sattazahn was convicted by a jury of first-degree murder and other related offenses and sentenced to death in connection with the robbery and shooting death of Richard Boyer, the manager of a restaurant.[1] Commonwealth v. Sattazahn, 763 A.2d 359, 362 (2000), aff'd, 537 U.S. 101 (2003). The evidence admitted at his trial showed that, on the night of the murder, Sattazahn and his accomplice, Jeffrey Hammer, drove to the restaurant in an all-terrain vehicle ("ATV") and waited in a wooded area until the restaurant closed. Commonwealth v.

---

[1] Sattazahn was previously convicted of the same offenses following a jury trial in 1991; however, the Pennsylvania Superior Court reversed that conviction due to erroneous jury instructions. Commonwealth v. Sattazahn, 631 A.2d 597, 600, 615 (Pa. Super. Ct. 1993).

Sattazahn, 631 A.2d 597, 601 (Pa. Super. Ct. 1993). As Boyer walked to his car carrying the restaurant's receipts in a bank deposit bag, Sattazahn and Hammer emerged from the wooded area and demanded the bag. Id. When Boyer attempted to flee, Sattazahn and Hammer fired guns at him. Id. According to the evidence, Hammer had a .41 caliber Magnum revolver and Sattazahn had a .22 caliber Ruger. Id. Sattazahn fired his .22 caliber Ruger five times, hitting Boyer in the lower back, left shoulder, face, and back of his head, inflicting injuries which ultimately led to Boyer's death. Id. Sattazahn and Hammer fled in the ATV via railroad tracks behind the restaurant and inadvertently dropped a black duffel bag containing their guns. Id. Five shell casings were found at the scene and two bullets were recovered after Boyer's autopsy. (N.T. 1/15/99, Docket No. 16-7, at 141.) All matched the .22 caliber Ruger. (Id.) No other shell casings or bullets were recovered. (Id. at 138, 141.)

Two years later, in July 1989, Hammer was questioned by the police and gave a statement in which he implicated himself and Sattazahn in the murder. Sattazahn, 631 A.2d at 601. Hammer told the police that he and Sattazahn had planned the robbery for some time but had only planned to rob Boyer. Id. He also told police about the lost duffel bag that contained the guns. Id. Two men subsequently found the bag lying along the railroad tracks. Id. The misplaced duffel bag was turned over to police the day after Hammer was questioned. Id. The officer who inventoried the duffel bag in 1989 testified that it contained two pairs of gloves, one ski mask, "two revolver clips, one cameo-type bag, two black [gun] holsters, one speed loader with six rounds of .41 mag[num] ammunition, eleven lo[o]se rounds of .41 mag[num] ammunition, and the .22 Ruger, .22 caliber target pistol and Smith and Wesson .41 caliber revolver," both with the serial numbers ground off. (N.T. 1/20/99, Docket No. 16-8, at 186.) One gun, the .22 caliber pistol, was the murder weapon, which had been purchased by Sattazahn and was registered to him. Sattazahn, 631 A.2d at 601.

In November 1989, the police were questioning an individual named Fritz Wanner concerning an unrelated burglary when the topic of Boyer's murder arose. (N.T. 1/21/99, Docket No. 16-10, at 378, 383.) Wanner was fourteen years old when Boyer's murder occurred, and Hammer's wife was his babysitter. (Id. at 371, 374.) Wanner testified that several days after the murder, he was hiding in a barn owned by Hammer's father-in-law when he overheard a conversation between Hammer and Sattazahn. (Id. at 373-74.) During this conversation, Sattazahn called Hammer an "idiot and asshole for dropping the bag" and threatened to kill Hammer and hurt his wife and child if they "g[ot] caught for this." (Id. at 375.) According to Wanner, Sattazahn also stated that "Hammer couldn't hit him and he [Sattazahn] had to grab the gun to shoot him," thereby admitting to shooting Boyer himself. (Id. at 376.) Wanner also remembered hearing that "[t]hree shots were fired." (Id. at 377.)

In 2003, Sattazahn filed a pro se petition pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"). Counsel filed an amended petition on his behalf. Commonwealth v. Sattazahn, No. 2194-89, Docket No. 16-30, slip. op. at 4. After several hearings and oral argument, the PCRA court denied Sattazahn's request for a new trial. Id. However, it found that Sattazahn's trial counsel was ineffective for failing to investigate and present adequate mitigation evidence in the penalty phase and granted Sattazahn a new penalty hearing. Id. at 5. The Pennsylvania Supreme Court affirmed and remanded the case for a new penalty hearing in 2008. Commonwealth v. Sattazahn, 952 A.2d 640, 657, 671 (Pa. 2008). The Commonwealth declined to retry the penalty phase, and in 2017, Sattazahn was sentenced to life imprisonment.

Sattazahn filed a timely Petition for Writ of Habeas Corpus with this Court on July 19, 2017, and subsequently filed an Amended Petition on April 6, 2018. The Amended Petition for Writ of Habeas Corpus asserts four claims for relief: (1) the Commonwealth denied Sattazahn his

due process rights under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), by withholding material, exculpatory impeachment evidence and failing to correct false testimony at trial; (2) trial counsel was ineffective for failing to adequately investigate and cross-examine Hammer; (3) Sattazahn is entitled to a new trial because of improper jury instructions; and (4) the cumulative effects of his <u>Brady</u> and ineffective assistance claims entitle Sattazahn to relief.

In a thorough and well-reasoned Report and Recommendation, Magistrate Judge Lynne A. Sitarski recommends that we deny Sattazahn's claims for relief in their entirety. Sattazahn has since withdrawn his claim related to improper jury instructions and has filed Objections to the Report and Recommendation regarding his remaining claims, as well as an Objection to the Magistrate Judge's November 27, 2019 Order denying his motion for discovery.

## II.    STANDARD OF REVIEW

Where a habeas petition has been referred to a magistrate judge for a report and recommendation, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. . . . [T]he court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Pursuant to 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petition for habeas corpus may be granted only if (1) the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;" or (2) the adjudication resulted in a decision that was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists

could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Moreover, "[f]actual issues determined by a state court are presumed to be correct and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence." Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000) (citing 28 U.S.C. § 2254(e)(1)).

## III. DISCUSSION

Sattazahn objects to four of the Magistrate Judge's Recommendations:

(1) the recommendation that Hammer's undisclosed impeachment evidence was not material under Brady;

(2) the recommendation that we should defer to the state court's finding that the Commonwealth's failure to disclose a tacit understanding between Wanner and the Commonwealth did not violate Brady or Giglio v. United States, 405 U.S. 150 (1972);

(3) the recommendation that trial counsel was not ineffective for failing to adequately cross-examine Hammer;

(4) the recommendation that there are no Brady and ineffective assistance of counsel errors that would entitle Sattazahn to relief from his conviction under a cumulative effects theory.

As noted above, Sattazahn also objects to the Magistrate Judge's November 27, 2019 Order denying his request for discovery.

A. *Brady* Claim

1. *The Undisclosed Impeachment Evidence*

In his Amended Petition for Writ of Habeas Corpus, Sattazahn first contends that the prosecutor's failure to turn over impeachment evidence relating to Wanner violated Brady. As detailed above, Wanner testified that he overheard a conversation in which Sattazahn told Hammer

that he had to grab the gun from Hammer and shoot the victim because Hammer missed. (N.T. 1/21/99, Docket No. 16-10, 374-76.)

At the PCRA hearing, Hammer testified that he informed District Attorney Mark Baldwin in a meeting prior to trial that he disputed parts of Wanner's statements. (See N.T. 7/13/05, Docket No. 16-28, at 60-62.) Although Hammer confirmed in his PCRA testimony that he and Sattazahn had a conversation in the barn, he also testified that he told Baldwin that he disagreed with Wanner's statement that Sattazahn said he had to grab the gun and shoot the victim. (Id. at 60-61.) After the meeting with Hammer, Baldwin made the following notes: "Asked about Fritz Wanner's statements. Remembers a conversation . . . . About a week after shooting[;] discussion in Barn[;] possible that Fritz Wanner was in Barn in another section." (Id. at 24 of 26.) However, neither the notes nor the content of Baldwin's conversation with Hammer were disclosed to Sattazahn. Sattazahn argues that Baldwin's conversation with Hammer about Wanner's statement is material impeachment evidence that the prosecution suppressed in violation of Brady.

### 2. *The Pennsylvania Supreme Court's Decision*

When Sattazahn argued to the Pennsylvania Supreme Court that Baldwin's failure to disclose this evidence violated his due process rights under Brady, the Pennsylvania Supreme Court denied that claim, noting that Sattazahn "was a participant in the conversation which the notes concerned. Therefore, . . . the content of [his] own statements should have been known to [Sattazahn], to the same degree as it was known to Hammer." Sattazahn, 952 A.2d at 658. The Pennsylvania Supreme Court reasoned that "[n]o Brady violation occurs where the defendant knew or could have uncovered the relevant evidence with reasonable diligence." Id. (citations omitted).

The Magistrate Judge recommends, without objection, that we must assess Sattazahn's Brady claim de novo because the Pennsylvania Supreme Court unreasonably applied Brady insofar as it improperly imposed a diligence requirement on Sattazahn. See Dennis v. Sec'y, Pa. Dep't Corr., 834 F.3d 263, 293 (3d Cir. 2016) ("Adding due diligence, whether framed as an affirmative requirement of defense counsel or as an exception from the prosecutor's duty, to the well-established three-pronged Brady inquiry would similarly be an unreasonable application of, and contrary to, Brady and its progeny."). Indeed, when a federal court reviewing a habeas petition finds "that the state court analyzed the petitioner's claim in a manner that contravenes clearly established federal law, [the federal court] then must proceed to review the merits of the claim de novo to evaluate if a constitutional violation occurred." Vickers v. Superintendent Graterford SCI, 858 F.3d 841, 849 (3d Cir. 2017) (citing Lafler v. Cooper, 566 U.S. 156, 174 (2012)). Here, the Pennsylvania Supreme Court did, in fact, unreasonably apply Brady by factoring Sattazahn's diligence into its analysis, and we therefore evaluate the merits of Sattazahn's Brady claim de novo.

### 3. *Brady Materiality Standard*

Brady held "that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. To constitute a Brady violation, the undisclosed evidence must meet three criteria: "'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" Banks v. Dretke, 540 U.S. 668, 691 (2004) (quoting Strickler v. Greene, 527 U.S. 263, 281-82 (1999)). In other words, a verdict will be overturned for a Brady violation only if the

petitioner can establish both "that evidence in the possession of the government was actually suppressed, and . . . that the suppressed evidence was material." Slutzker v. Johnson, 393 F.3d 373, 386 (3d Cir. 2004).

Evidence is material if it "'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Banks, 540 U.S at 698 (quoting Kyles v. Whitley, 514 U.S. 419, 435 (1995)). That is, the petitioner must show a "reasonable probability of a different result" had the evidence been disclosed. Id. at 699 (quoting Kyles, 514 U.S. at 434). A reasonable probability of a different result does not require that the petitioner "show that he 'more likely than not' would have been acquitted had the new evidence been admitted. . . . only that the new evidence is sufficient to 'undermine confidence' in the verdict." Wearry v. Cain, 577 U.S. 385, 392 (2016) (quoting Smith v. Cain, 565 U.S. 73, 74-76 (2012)).

The Supreme Court has explained that evidence that has been withheld by the prosecution "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985)). "'[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . .'" Johnson v. Folino, 705 F.3d 117, 128-29 (3d Cir. 2013) (alterations in original) (quoting Kyles, 514 U.S. at 434). Rather, "[a] 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" Kyles, 514 U.S. at 434 (quoting Bagley, 473 U.S. at 678). Our "inquiry is whether the undisclosed evidence is admissible itself or could have led to the discovery of admissible evidence that could have made a difference in the outcome of the trial . . . ." Dennis, 834 F.3d at 310 (quoting Johnson, 705 F.3d at 130).

4.    *Materiality of the Undisclosed Impeachment Evidence*

The Magistrate Judge recommends that we deny Sattazahn's <u>Brady</u> claim grounded on the Commonwealth's failure to disclose Baldwin's notes concerning his conversation with Hammer about Wanner's statement because the notes had little impeachment value and were not material. Sattazahn objects to the Magistrate Judge's recommendation on three grounds.[2]  First, Sattazahn argues that the Magistrate Judge improperly limited her <u>Brady</u> analysis to Baldwin's notes, when she should have also considered that the Commonwealth failed to disclose that Hammer told Baldwin, as he testified at the PCRA hearing, that he disagreed with Wanner's statements.  Second, Sattazahn contends that the Magistrate Judge erroneously discounted Wanner's testimony about what he heard in the barn as merely cumulative of other evidence of guilt and, finally, he argues that the Magistrate Judge erred in finding that the suppressed evidence was not material.

The ultimate issue before us on de novo review is whether the undisclosed impeachment evidence was material under <u>Brady</u>.  As stated above, a <u>Brady</u> violation requires "[t]he evidence at issue [to] be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, . . . and prejudice must have

---

[2] After Sattazahn's Objections were fully briefed, Sattazahn filed a Notice of Supplemental Authority, asking us to consider a recent decision from the Berks County Court of Common Pleas in which the court emphasized Baldwin's "egregious" prosecutorial misconduct in an unrelated matter in which he failed to disclose <u>Brady</u> material.  <u>See</u> <u>Commonwealth v. Roderick Johnson</u>, 0118-97; 1537-97 (Berks County, October 29, 2020).  He contends that the Berks County decision further supports his claim that Baldwin violated <u>Brady</u> in the instant case.  The Commonwealth objects to our consideration of that authority, asserting that the decision does not contain any new Federal law or factual finding regarding Sattazahn's case.

Our "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011).  Baldwin's misconduct in the Berks County case was not part of the record before the state court.  Accordingly, we conclude that we cannot consider that conduct here.  We further note that our ultimate resolution of the <u>Brady</u> issues in this case do not depend on a finding that Baldwin had no history of <u>Brady</u> violations.  Thus, the supplemental information that Sattazahn asks us to consider would in no way impact our analysis of his claims.

ensued." Banks, 540 U.S. at 691 (quoting Strickler, 527 U.S. at 281-82). Moreover, in assessing materiality, we must evaluate not only the suppressed evidence itself, but where that evidence could have led. Dennis, 834 F.3d at 310 (quoting Johnson, 705 F.3d at 130). Here, Baldwin's undisclosed notes could have led to additional impeachment evidence—Hammer's contrary account of the conversation in the barn. Accordingly, we consider whether the notes and Hammer's conflicting account of the conversation in the barn, which he shared with Baldwin, were material.

Sattazahn argues that the information that Hammer disagreed with Wanner's account of the conversation in the barn was material impeachment evidence because it undermined Wanner's testimony that Sattazahn admitted to shooting the victim, which was the only evidence that Sattazahn confessed to the murder. "[E]vidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." Smith, 565 U.S. at 76 (citing United States v. Agurs, 427 U.S. 97, 112-13, and n.21 (1976)). "Suppressed evidence that . . . would be used to impeach testimony of a witness whose account is strongly corroborated is generally not considered material for Brady purposes. . . . [H]owever, undisclosed evidence that would seriously undermine the testimony of a key witness may be considered material when it relates to an essential issue or the testimony lacks strong corroboration." Johnson, 705 F.3d at 129 (internal citations omitted); see also Banks, 540 U.S. at 672, 700-01 (holding that impeachment evidence was material when it related to an informant who was the "centerpiece" of the prosecution's case and the informant's testimony was "uncorroborated by any other witness.")

Here, as Sattazahn contends, Wanner's testimony that Sattazahn confessed to being the shooter was not corroborated. However, that a conversation took place in the barn and that Sattazahn was, in fact, the one who shot the victim were facts corroborated not only by Hammer,

but also by physical and circumstantial evidence.  Indeed, at the PCRA hearing, Hammer largely corroborated Wanner's account by admitting that a conversation between he and Sattazahn took place in the barn and that Sattazahn threatened to harm Hammer's family if he was caught.  (See N.T. 7/13/05, Docket No. 16-28, at 19-22, 60-62.)  Hammer disagreed only with Wanner's recounting that Sattazahn stated that he "grabb[ed] the gun . . . and sho[t Boyer]."  (Id. at 60.)

More importantly, the Commonwealth introduced at trial substantial evidence other than Wanner's testimony to establish that Sattazahn shot Boyer.  Hammer testified at trial that he had been friends with Sattazahn for five years at the time of the murder and saw him "almost every[]day."  (See N.T. 1/21/99, Docket No. 16-8, at 264-67.)  He testified regarding the details of the plans leading up to the robbery and murder, as well as the events that followed.  (See id. at 268-77; 281-316.)  Hammer said he and Sattazahn developed a "mutual" plan to rob Boyer, going to the restaurant where Boyer worked "on several occasions to watch [Boyer] leave with the money" in order to gain an understanding of his routine.  (Id. at 268-69.)  Hammer recounted that, on the night of the robbery, Sattazahn came to Hammer's father-in-law's house where Hammer was living at the time.  (Id. at 270.)  The men rode an ATV to a nearby furnace to recover a black duffel bag containing their guns and other items that they had stored there, then traveled in the ATV to the restaurant, located three miles away.  (Id. at 270-73.)  The black bag contained "two handguns [], holsters, some extra ammunition, a clip for one of the guns, [and] some thin gloves" and was strapped to the back of the ATV.  (Id. at 272-73.)

Hammer testified that he and Sattazahn rode to a bridge near the restaurant and parked the ATV around 10:00 p.m.  (Id. at 274-75.)  According to Hammer, he was carrying the .41 and Sattazahn was carrying the .22, which was Sattazahn's gun, although Hammer had been with Sattazahn when he purchased it.  (Id. at 274, 301.)  Armed with their guns, they waited in a wooded

area behind the restaurant for 45 minutes to an hour. (Id. at 275.) The plan was "[j]ust to rob [Boyer] to take the money and handcuff him and put him in the back of the truck and leave." (Id. at 283.) However, as Boyer approached his truck, Sattazahn told him to drop and the bank bag that contained the restaurant's deposits. (Id. at 284.) Boyer threw the bank bag, and Sattazahn told him to go pick it up. (Id.) Boyer complied but again threw the bag and turned to run. (Id. at 284-86.) Hammer heard Sattazahn fire a shot, so Hammer shot one shot in the air, assuming that they were sticking to the plan and firing warning shots. (Id. at 287.) Hammer said that, after his shot, he heard two or three shots and saw Boyer fall to the ground. (Id. at 288.)

Hammer testified that he and Sattazahn then ran over to the bank bag, which was lying a couple of feet from Boyer. (Id.) Sattazahn grabbed the bank bag and he and Hammer went back to the ATV, where they returned their guns and holsters to the duffel bag. (Id. at 288, 291.) They secured the duffel bag to the back of the ATV using bungee cords and drove back to the furnace using the railroad tracks. (Id. at 293.) There, they counted the money. (Id. at 295-96.) A week or two later, they returned to the furnace, and realized that they had lost the duffel bag containing their guns and supplies. (Id. at 298.) The following morning, they searched the tracks but never found it. (Id.)

During closing arguments, the Commonwealth reiterated Hammer's version and emphasized the physical evidence that supported Hammer's account. (See N.T. 1/21/99, Docket No. 16-10, at 483-85.) Specifically, as Hammer had stated, the misplaced duffel bag contained two guns, two pairs of gloves, two holsters, and two types of ammunition. Moreover, there was evidence that the .22 was the murder weapon and that the .22 had been purchased by and registered to Sattazahn supporting Hammer's account that Sattazahn was the shooter. In sum, although Wanner's testimony that Sattazahn had confessed in the barn was not corroborated, the essential

facts to which Sattazahn confessed were corroborated—by both Hammer and the physical and circumstantial evidence discussed above.

Wanner's role at the trial, on the other hand, was relatively insignificant. (See id. at 370-80.) As described in greater detail above, Wanner testified that several days after the murder, he overheard a conversation between Hammer and Sattazahn, in which Sattazahn stated that "Hammer couldn't hit him and he [Sattazahn] had to grab the gun to shoot him." (Id. at 376.) Notably, the Commonwealth did not rely heavily on Wanner's testimony in its roughly eighteen-page closing arguments:

> You heard Fritz Wanner testify. Fritz Wanner told you about a conversation he heard several days after he learned about the Heidelberg murder he learned from the newspaper and television. And what did he hear, he was in Phil Long's garage or barn, Katie Long's house. He heard two men. He heard this defendant tell Jeffrey Hammer words about dropping the black bag. He heard David Sattazahn admit to shooting the manager. He made other statements about if he got caught what he would do to Jeffrey Hammer and Hammer's family. You must decide whether or not that statement corroborates Jeffrey Hammer.

(Id. at 489.)

Similarly, in his closing, Sattazahn's defense counsel recognized the primacy of Hammer's testimony and only briefly touched upon Wanner's testimony. (See id. at 461) (stating during closing arguments that "[t]he main witness in this case was Jeffrey Hammer. No question about it[.]"). Sattazahn's defense at trial was not that Hammer and Wanner merely misidentified the shooter, but that he was not involved in the robbery/murder at all and that Hammer instead acted entirely alone in both robbing and shooting Boyer. (See id. at 460, 463-64 ("I [] told you that Jeffrey Hammer was responsible for [Boyer's] murder and you heard his testimony"; "[T]here is no evidence . . . to indicate that more than one person was involved. . . . There were no fingerprints, no blood evidence, which would corroborate . . . the story of Jeffrey Hammer that more than one person was there.").) Furthermore, defense counsel alluded to Wanner's testimony only once,

stating that "there is only two pieces of evidence here that would prove . . . Sattazahn shot this gun"—Hammer and Wanner—and Wanner had a "prior record a mile long." (Id. at 469.)

Sattazahn maintains that Wanner's disclosure to Baldwin that he did not agree that Sattazahn had admitted in the barn to being the shooter was material because that supposed confession was the most damaging evidence and was likely dispositive of the outcome in his case. However, as explained above, "evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." Smith, 565 U.S. at 76 (citation omitted). Contrary to Sattazahn's contention, Wanner had a limited role at the trial and was not the "key witness" of the Commonwealth's case—Hammer was. See Johnson, 705 F.3d at 129; see also Banks, 540 U.S. at 701 (finding impeachment evidence material where it pertained to a witness who was the "centerpiece" of the prosecution's case). In other words, in order to convict Sattazahn, the jury necessarily had to credit Hammer's testimony, and even if Sattazahn's counsel had been able to impeach Wanner's testimony that Sattazahn confessed to being the shooter, the testimony from Hammer was more than sufficient to support the jury's verdict. Thus, even if the nondisclosed impeachment evidence had been turned over to the defense, we conclude that there is not a "reasonable probability of a different outcome" so as to "'undermine confidence' in the verdict." See Banks, 540 U.S. at 699 (quoting Kyles, 514 U.S. at 434); see also Wearry, 577 U.S. at 392 (quoting Smith, 565 U.S. at 75). Rather, the other evidence implicating Sattazahn in the murder was clearly "strong enough to sustain confidence in [Sattazahn's] verdict." See Smith, 565 U.S. at 76. Accordingly, on de novo review, we conclude that Sattazahn has not established that the undisclosed impeachment evidence relating to Wanner's testimony was material under Brady. See Dennis, 834 F.3d at 310. We therefore overrule Sattazahn's objection to this aspect of the Magistrate Judge's Report and Recommendation.

B. *Brady* and *Giglio/Napue* Claim

In his Amended Petition, Sattazahn also contends that the prosecutor's failure to disclose an implied agreement between Wanner and the Commonwealth for leniency in Wanner's pending criminal case, and the prosecutor's related failure to correct Wanner's testimony that he did not have such an agreement, violated both Brady and Giglio/Napue.

1. *Wanner's Testimony*

At the time of Wanner's testimony at Sattazahn's trial, Wanner had pending charges against him for an unrelated burglary. (See N.T. 1/21/99, Docket No. 16-10, at 379, 392.) He testified, however, that he did not expect anything in return for his testimony against Sattazahn. (Id. at 380, 393.) Specifically, on direct examination, Wanner testified:

> Q: You also currently have a charge pending here in Berks County?
> A: Yes, I do.
> Q: And that charge involves criminal attempt to commit burglary also?
> A: Yes.
>
> * * *
>
> Q: Sir, have you been promised anything for your testimony today?
> A: No, I have not.
> Q: Have you been promised anything for your pending case?
> A: No, I haven't.
> Q: Are you expecting anything today for testifying?
> A: No.

(Id. at 379-80.) On cross examination, Wanner similarly denied having any expectation of leniency in his pending case:

> Q: Now, Mr. Wanner, you now face . . . more charges in Berks County, correct?
> A: Yes.
> Q: And you are aware that based upon your lengthy criminal record that you are facing a lot of time in jail, is that a fair question?
> A: Um-hum.
> Q: You would agree with me on that, correct?
> A: Yes.
> Q: And you realized that your story to this jury is going to help you that it may help you in this pending case, correct?

15

A: No.

Q: Not at all?

A: No.

Q: You don't think this is going to help at all?

A: No, I don't.

(Id. at 392-93.)

Shortly after testifying at Sattazahn's 1999 trial, Wanner entered into a plea agreement in state court, which suggested that he be sentenced to two to four years for the burglary charge. (See N.T. 10/25/04, Docket No. 16-19, at 84, 87-88.) At Wanner's sentencing hearing, his defense counsel asked the court to consider Wanner's "substantial testimony in the Sattazahn case." (N.T. 2/12/99, Docket No. 16-19, at 136 of 185.) At the same hearing, the Commonwealth stated that it was "not aware of whatever consideration, if any, the defendant ha[d] received with regard to his cooperation in the Sattazahn case." (Id. at 139 of 185.) Wanner was ultimately sentenced to sixteen to forty-eight months. (N.T. 10/25/04, Docket No. 16-19, at 87-88.) Subsequently, Wanner admitted at Sattazahn's PCRA hearing that the district attorney "said he would not make any deal . . . but . . . would see what he could do in my upcoming case." (Id. at 70; see also N.T. 2/12/99, Docket No. 16-19, at 139 of 185 (reflecting that Wanner told the court at sentencing that Baldwin told him that "there are no deals, but he would see what he could do in my case coming up").)

2.    *Brady* and *Giglio*/*Napue* Standards in the Context of Agreements with the Prosecution

As discussed above, Brady requires the prosecution to disclose any evidence that is favorable to the accused and material. Brady, 373 U.S. at 87. "This disclosure obligation applies equally to impeachment evidence and requires the disclosure of agreements or deals—whether express or tacit—made with a witness." Lopez v. Beard, Civ. A. No. 04-4181, 2019 WL 2162300, at *3 (E.D. Pa. May 16, 2019) (citing Giglio, 405 U.S. at 154). "'Brady is not limited to formal

plea bargains, immunity deals or other notarized commitments. It applies to 'less formal, unwritten, or tacit agreement[s],' so long as the prosecution offers the witness a benefit in exchange for his cooperation . . . . " Akrawi v. Booker, 572 F.3d 252, 262 (6th Cir. 2009) (quoting Harris v. Lafler, 553 F.3d 1028, 1034 (6th Cir. 2009)) (first alteration in original); see also Bagley, 473 U.S. at 683 (noting that the "possibility of a reward" in exchange for testimony need not be "guaranteed through a promise or binding contract" to constitute a Brady violation).

Circuit courts interpreting Brady have concluded that "[a] witness's expectation of a future benefit is not determinative of the question of whether a tacit agreement subject to [Brady] disclosure existed." Bell v. Bell, 512 F.3d 223, 233 (6th Cir. 2008); see also Akrawi, 572 F.3d at 263 ("[T]he mere fact that a witness desires or expects favorable treatment in return for his testimony is insufficient . . . ."); Wisehart v. Davis, 408 F.3d 321, 325 (7th Cir. 2005) ("[W]hat one party might expect from another does not amount to an agreement between them."). Rather, "there must be some assurance or promise from the prosecution that gives rise to a *mutual* understanding or tacit *agreement*" that the witness will be given favorable treatment. Akrawi, 572 F.3d at 263. Furthermore, a witness's subsequent receipt of favorable treatment does not necessitate a conclusion that an understanding or agreement existed. See Rega v. Wetzel, Civ. A. No. 13-1781, 2018 WL 897126, at *27 (W.D. Pa. Feb. 15, 2018) (citing Bell, 512 F.3d at 234); see also Bracey v. Superintendent Rockview SCI, 986 F.3d 274, 298 n.1 (3d Cir. 2021) ("[P]ost-trial favorable treatment of a witness is not within the scope of *Brady* disclosures."); Shabazz v. Artuz, 336 F.3d 154, 165 (2d Cir. 2003) ("[T]he fact that a prosecutor afforded favorable treatment to a government witness, standing alone, does not establish the existence of an underlying promise of leniency in exchange for testimony.").

In addition to its obligations under <u>Brady</u>, the government has obligations under <u>Giglio</u>. Under <u>Giglio</u>, a prosecutor "violates the Fourteenth Amendment's due process guarantee [if he] knowingly presents or fails to correct false testimony [regarding an agreement] in a criminal proceeding." <u>Haskell v. Superintendent Greene SCI</u>, 866 F.3d 139, 145-46 (3d Cir. 2017) (citing <u>Napue v. People of State of Ill.</u>, 360 U.S. 264, 269 (1959), and <u>Giglio</u>, 405 U.S. at 153) (additional citation omitted). Indeed, "'a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" <u>Id.</u> at 146 (quoting <u>Agurs</u>, 427 U.S. at 103, <u>holding modified by</u> <u>Bagley</u>, 473 U.S. at 667).

3.     *The PCRA Court's Decision*

The PCRA court found that no agreement existed between Wanner and the Commonwealth and, as a result, it denied Sattazahn's <u>Brady</u> and <u>Giglio</u>/<u>Napue</u> claim. Further, it found that even if an agreement existed, Sattazahn failed to show a reasonable likelihood that his testimony affected the jury's decision. Specifically, the PCRA court stated:

> Due process requires that any potential understanding between the prosecution and a witness be revealed to the jury. However, the disclosure rules only apply when an actual agreement exists and mere conjecture is insufficient to prove a <u>Brady</u> violation . . . . Moreover, a defendant's subjective hope and even expectation of more lenient treatment is not something the Commonwealth is required . . . to disclose.
>
> * * *
>
> [Sattazahn] has failed to disclose that any agreement between the District Attorney and Fritz Wanner actually existed. . . . . [While] the Berks County District Attorney's Office dismissed two of the pending charges less than a month after Wanner testified against him, . . . this does not confirm the existence of any agreement. . . . The Commonwealth cannot be found to have failed to disclose an agreement which has not been proven to exist . . . .
>
> [E]ven if we would have found that an agreement existed, [Sattazahn] still would not be entitled to a new trial because he has not established that the failure to

disclose this alleged agreement would have raised a reasonable probability that the outcome of trial would have been different if it had been produced. . . . The jury was made aware of many reasons why his testimony may not have been credible, yet they still convicted [Sattazahn]. Any additional impeachment evidence would not have changed the outcome of the trial.

Commonwealth v. Sattazahn, No. 2194-89, Docket No. 16-30, slip op. at 23-25 (Berks County Ct. Comm. Pleas June 16, 2006) (citations omitted).

The Magistrate Judge recommends that we defer to the PCRA court's reasonable factual finding that no agreement existed between Wanner and the Commonwealth in exchange for Wanner's testimony, and, alternatively, the PCRA court reasonably concluded that even if an agreement did exist, the non-disclosure of the agreement and Wanner's "false testimony" would not have affected the jury's judgment. Sattazahn objects, arguing that the PCRA court unreasonably applied clearly established Federal law in determining what constitutes an agreement that must be disclosed under Brady and therefore erred in concluding that there was no agreement that was subject to Brady disclosure.[3] Sattazahn also objects to the Magistrate Judge's recommendation that the PCRA court reasonably denied Sattazahn's claim on the alternative basis that he failed to show that the non-disclosure or "false testimony" affected the jury's judgment.

---

[3] Sattazahn argues that we must apply a de novo standard of review to his claim concerning Wanner's alleged agreement because the PCRA court misapplied Brady when it imposed a due diligence requirement in its analysis of his claim concerning the undisclosed notes and conversation in the barn. However, the PCRA court did not impose a due diligence requirement on Sattazahn in rejecting his Brady claim concerning Wanner's alleged agreement with the Commonwealth, i.e., it never reasoned that Sattazahn should have uncovered the alleged agreement on his own. Moreover, Sattazahn cites no authority for his assertion that a state court's application of an incorrect standard in connection with one claim necessitates de novo review in connection with a wholly different claim. Accordingly, we cannot conclude that the PCRA court's error in imposing a due diligence requirement in connection with the prior Brady claim necessitates de novo review in connection with the instant claim.

4.    *The Reasonableness of the PCRA Court's Decision*

Sattazahn maintains that the PCRA court unreasonably applied Supreme Court precedent in concluding that Baldwin's statement to Wanner was not required to be disclosed because it erroneously assumed that only firm deals are subject to <u>Brady</u> disclosure, without recognizing that tacit or implied deals, including inducements to testify, must also be disclosed. Sattazahn argues that the prosecutor's statement that he "would see what he could do in [Wanner's] case coming up" established a tacit agreement and/or an inducement that was subject to <u>Brady</u> disclosure. (N.T. 10/25/04, Docket No. 16-19, at 87); <u>see</u> <u>Bagley</u>, 473 U.S. at 683-84 (reversing denial of federal habeas relief and remanding to decide whether undisclosed information regarding the "possibility of a reward" was a <u>Brady</u> violation).

"The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003) (citing <u>Williams v. Taylor</u>, 529 U.S. 362, 410, 412 (2000)). Rather, "[t]he state court's application of clearly established law must be objectively unreasonable." <u>Id.</u> (citing <u>Williams</u>, 529 U.S. at 409). Clearly established law is determined only by the United States Supreme Court. <u>See</u> <u>Carey v. Musladin</u>, 549 U.S. 70, 77 (2006) (concluding that there was no unreasonable application of clearly established Federal law where there was a "lack of holdings from th[e Supreme] Court").

In arguing that the PCRA court unreasonably applied Supreme Court law, Sattazahn primarily relies on the Supreme Court's decision in <u>Bagley</u>. In <u>Bagley</u>, the Supreme Court held that the government was required to disclose unsigned witness contracts, which provided that the witnesses would be paid $300 if they supplied information that "led to 'the accomplishment of the objective sought to be obtained . . . to the satisfaction of [the Government].'" 473 U.S. at 683 (alterations in original). The Court reasoned that this "possibility of a reward gave [the witnesses]

a direct, personal stake in [the defendant's] conviction." Id. The Court added that "[t]he fact that the [reward] was not guaranteed through a promise or binding contract, but was expressly contingent on the [g]overnment's satisfaction with the end result, served only to strengthen any incentive to testify falsely in order to secure a conviction." Id.

Bagley thus stands for the proposition that when the government incentivizes a witness to testify falsely, by suggesting a particular reward for testimony that produces a favorable result, that incentive must be disclosed to the defense. See id. The situation in Sattazahn's case is readily distinguishable from that in Bagley because Wanner merely testified that when he talked to Baldwin about testifying, Baldwin told him that he "would see what he could do" in Wanner's upcoming case. (N.T. 10/25/04, Docket No. 16-19, at 70.) Baldwin did not specify what it was that he "could do" and did not state that he would only "see what he could do" if Wanner's testimony produced a favorable result. (See id.) Under these circumstances, it was certainly not objectively unreasonable for the PCRA court to treat Baldwin's statement differently than the unsigned contracts at issue in Bagley, and we specifically reject Sattazahn's contention that the PCRA court's conclusion that there was no requirement that Baldwin's statement to Wanner in this case be disclosed was an unreasonable application of Supreme Court law as set forth in Bagley.

We also find many of the above-referenced "[d]ecisions from other courts [to be] persuasive [in] determining [that the PCRA court's decision was not] an 'unreasonable application of' the law of the United States Supreme Court." Rega, 2018 WL 897126, at *31 (citing Musladin, 549 U.S. at 76-77). As noted above, other courts have concluded that Brady does not require the government to disclose "the mere fact that a witness desires or expects favorable treatment in return for his testimony" when there has been no "assurance or promise" from the government of favorable treatment and, here, whatever Wanner's actual expectations, Baldwin's statement that

he "would see what he could do" simply cannot be characterized as an assurance or promise of favorable treatment. Akrawi, 572 F.3d at 263. In addition, while other courts have suggested that "[t]he existence of a pending prosecution against a government witness provides an inherent incentive for cooperation," the prosecution here disclosed Wanner's pending prosecution, thereby satisfying any Brady obligation to disclose that "inherent incentive." Shabazz, 336 F.3d at 164. And, finally, the fact that Wanner may have received somewhat favorable treatment at his sentencing on his pending burglary prosecution is not determinative that an implied or tacit agreement for favorable treatment existed. See Bracey, 986 F.3d at 298 n.1 ("[P]ost-trial favorable treatment of a witness is not within the scope of *Brady* disclosures."); Shabazz, 336 F.3d at 165 ("[T]he fact that a prosecutor afforded favorable treatment to a government witness, standing alone, does not establish the existence of an underlying promise of leniency in exchange for testimony.")). With these decisions in mind, we reiterate that the PCRA court's decision that Baldwin's statement to Wanner did not require disclosure was objectively reasonable and that, even if it was arguably incorrect, it simply was not an unreasonable application of Federal law as determined by the Supreme Court. Accordingly, we overrule Sattazahn's objection to the Magistrate Judge's recommendation that the PCRA court reasonably rejected Sattazahn's claim that his rights as articulated in Brady and Giglio were violated by the Commonwealth's failure to either disclose Baldwin's alleged inducement or to correct Wanner's trial testimony that he did not expect anything in return for his testimony.

It is also worth adding that the PCRA court alternatively rejected Sattazahn's Brady/Giglio claim on the basis that Sattazahn had not established a reasonable probability of a different trial outcome had the jury known of an agreement between Wanner and the Commonwealth. Sattazahn, No. 2194-89, Docket No. 16-30, slip op. at 23-25 (citations omitted). In this regard, the PCRA

court specifically noted that "[t]he jury was made aware of many reasons why his testimony may not have been credible . . . . Any additional impeachment evidence would not have changed the outcome of the trial."  Id.  It was not unreasonable for the PCRA court to reach this conclusion where the jury was properly told of Wanner's pending state prosecution and thus was already aware of his inherent incentive to cooperate against Sattazahn.

Moreover, as we explained above, Wanner's role at trial was relatively insignificant as the primary evidence against Sattazahn was Hammer's detailed testimony and the corroborating physical evidence.  Accordingly, even if Wanner's credibility was impeached, there was other substantial evidence, including the murder weapon, that linked Sattazahn to the crime and corroborated Hammer's testimony.  We therefore conclude that it was not objectively unreasonable for the PCRA court to decide that, even if a tacit agreement had existed between Wanner and the Commonwealth and was disclosed, it would not have created a "reasonable probability of a different result."  Banks, 540 U.S. at 699 (quoting Kyles, 514 U.S. at 434).

Accordingly, in addition to overruling Sattazahn's objection to the Magistrate Judge's recommendation that the PCRA court did not unreasonably apply Supreme Court precedent in concluding that there was no agreement that had to be disclosed, we also overrule Sattazahn's objection to the recommendation that the PCRA court did not commit reversible error in concluding that there was no reasonable probability that disclosure of any tacit agreement would have affected the outcome of the trial.  We therefore approve and adopt the Magistrate Judge's recommendation that the PCRA court reasonably denied Sattazahn's Brady/Giglio claim on both of these bases.

C.    Ineffective Assistance of Counsel Claims

Sattazahn's Amended Petition asserts that the Pennsylvania Supreme Court unreasonably applied Strickland insofar as it found that his trial counsel was not ineffective for failing to impeach Hammer with deceptive statements from a police examination that was subject to a polygraph and failing to use additional impeachment evidence.  The Magistrate Judge has recommended that the Pennsylvania Supreme Court reasonably rejected these ineffectiveness claims, and Sattazahn objects to her recommendations.

1.    *Strickland* Standard

The standard for ineffective assistance of counsel claims is set forth in Strickland v. Washington, 466 U.S. 668 (1984).  A petitioner must first show that counsel's performance was deficient, meaning "that counsel's representation fell below an objective standard of reasonableness."  Id. at 687-88.  However, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  Id. at 691.  Therefore, a petitioner must also show that counsel's performance was prejudicial.  Id. at 692.  In determining the reasonableness of counsel's performance, a court must be "highly deferential" to counsel's performance and "indulge a strong presumption that counsel's conduct falls within [a] wide range of reasonable professional assistance."  Id. at 689.  "[R]eview of ineffective assistance of counsel claims does not permit us, with the benefit of hindsight, to engage in speculation about how the case might best have been tried.  We therefore accord counsel's strategic trial decisions great deference."  Hess v. Mazurkiewicz, 135 F.3d 905, 908 (3d Cir. 1998).  "Thus, . . . a defendant must overcome the 'presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.''"  Bell v. Cone, 535 U.S. 685, 698 (2002) (quoting Strickland, 466 U.S. at 689).  In

determining the second prong that the petitioner was prejudiced by counsel's performance, we determine "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Strickland, 466 U.S. at 695.

Furthermore, "[w]hen the claim at issue is one for ineffective assistance of counsel . . . AEDPA review is 'doubly deferential,' because counsel is 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (quoting Cullen v. Pinholster, 563 U.S. 170, 190 (2011), Burt v. Titlow, 571 U.S. 12, 22 (2013)). "[T]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington, 562 U.S. at 105.

When reviewing an ineffective assistance of counsel claim under habeas, "federal courts are to afford 'both the state court and the defense attorney the benefit of the doubt.'" Woods, 136 S. Ct. at 1151 (quoting Burt, 571 U.S. at 15). The petitioner bears of the burden of demonstrating "that it was necessarily unreasonable for the [state court] to conclude: (1) that he had not overcome the strong presumption of competence; and (2) that he had failed to undermine confidence in the jury's sentence . . . ." Pinholster, 563 U.S. at 190.

    2.    *Counsel's Failure to Impeach Hammer with Deceptive Statements During Police Examination*

    a.    <u>The Police Examination</u>

Hammer made statements during a police examination that were subject to a polygraph. Some of Hammer's statements conflicted with his trial testimony. The polygraph results indicated Hammer's responses to the following four questions during the examination were deceptive:

Q: In April 1987, did you help anyone to shoot BOYER?
A: No.
Q: In April 1987, did you shoot BOYER?

A: No.
Q: Right now, do you know where the gun is that was used to shoot BOYER?
A: No.
Q: In April 1987, were you physically present when BOYER was shot?
A: No.

(N.T. 10/25/04, Def. Ex. 25, Docket No. 16-20, at 229-30 of 234.)  After being informed that his

responses were deceptive, Hammer gave a revised statement implicating himself and Sattazahn.

(See id. at 230-33.)  The state police discussed administering Hammer an additional polygraph test

following the revised statement, but Hammer refused after speaking with his attorney.  (See N.T.

10/25/04, Def. Ex 26, Docket No. 16-21, at 2 of 122.)

Subsequently, at the PCRA hearing, trial counsel testified regarding his failure to use the

statements from the police examination to impeach Hammer:

> PCRA Counsel: Mr. Adams, do you – did you have any reason for not asking Mr.
> Hammer about the answers and statements that he first gave the State Police
> regarding this case where he denied involvement?
>
> * * *
>
> Trial Counsel: Maybe I'm incorrect. I thought there was some pretrial ruling
> regarding the polygraph. I may be incorrect. But I thought there was. If I'm
> incorrect—your question again is?
>
> PCRA Counsel: My question is, was there any reason why you didn't ask Mr.
> Hammer about the statements where he denies involvement with the incidents?
>
> Trial Counsel: My interpretation most likely would have been—I can't recall
> specifically today why I did not.  I would only have to—
>
> The Court: Well, if you can't recall, you can't recall.
>
> Trial Counsel: I can't recall.
>
> PCRA Counsel: Now do you remember that Mr. Hammer was found to be
> deceptive when he answered the questions that I just read into the record?
>
> Trial Counsel: Yes.

PCRA Counsel: If you could have found a legal doctrine to have that finding admitted before the jury, would you have gotten that finding admitted before the jury?

Trial Counsel: I don't think so. This is a double edge sword here. If I would have . . . put evidence in front of the jury that [Hammer] lied to the questions that were given in this polygraph . . . I would have then been putting in front of the jury that he is now telling the truth because his answers at trial were different from [the polygraph responses]. So as I'm recalling this now, I would have absolutely not done that other than to go with the general premise that he's lied to the police in the past. . . .

* * *

I would be showing that [Hammer's] now telling the truth because his answers to the questions [at trial] would have been contrary. So I would never had asked questions like that.

PCRA Counsel: Well, he was asked . . . did you shoot Boyer. And he responded, No?

Trial Counsel: Correct.

PCRA Counsel: And he was found deceptive with respect to that question, is that your understanding?

Trial Counsel: Yes.

PCRA Counsel: Okay. So that's not inconsistent with his trial testimony?

Trial Counsel: No. But—as my interpretation is I would never be able to ask one if I can't ask the others. . . . If I would have been able under some legal doctrine to ask a question which was put forth to Mr. Hammer during a polygraph, if I could ask one it was my interpretation that then I could also ask the others, so could the Commonwealth.

(N.T. 11/22/04, Docket No. 16-19, at 215-18.) Sattazahn's trial counsel later testified about his

strategic reason for failing to impeach Hammer with the deceptive responses from the polygraph:

PCRA Counsel: [D]id you have a strategic reason . . . for not attempting to put before the jury that Mr. Hammer was found deceptive with respect to answering these four questions?

Trial Counsel: Yes, because it would open the door to vouch for his credibility in so far that his answers now were different from his responses in which he failed the polygraph test.  And, therefore, that would boost his credibility.

PCRA Counsel: So you envision a scenario, if I have this right, where the Commonwealth would either argue or put on evidence that Mr. Hammer was now being truthful because his answers were different from what he was found deceptive at the time of the lie detector test?

Trial Counsel: It absolutely could turn around that way.

(Id. at 218-19).  Trial counsel also stated that he failed to question Hammer because he believed

that the polygraph results were inadmissible:

Trial Counsel: In thinking back to this line of questioning . . . I think it was my interpretation that evidence regarding the polygraph was inadmissible.  And that's probably why I didn't broach the subject.

(Id. at 222.)  Although trial counsel was under the impression that he could not question Hammer

regarding the polygraph test, he testified that he would have used Hammer's deceptive responses

during the police examination if he could have:

PCRA Counsel: Mr. Adams, just going back to the polygraph that we were talking about a little earlier?

Trial Counsel: Yes.

PCRA Counsel: Would it have been – you wanted to use any evidence that you could from which the jury could have reasonably believed that someone other than David Sattazahn was the shooter; is that right?

Trial Counsel: Yes.

PCRA Counsel: And so that would include putting before the jury, if you could, a finding that Mr. Hammer was deceptive when he denied being a shooter, is that fair?

Trial Counsel: Well, if I could have done that, that he was deceptive in a polygraph, if I could have gotten that evidence admitted—

PCRA Counsel: You would have done that, right?

Trial Counsel: I probably would have done that. If I could have got the fact that he took a lie detector test and the results of those lie detector tests into evidence, of course I would have done that.

(Id. at 235-36.)

b.  The Pennsylvania Supreme Court's Decision

The Pennsylvania Supreme Court rejected Sattazahn's claim that counsel was ineffective in failing to impeach Hammer with his inconsistent statements during the police examination, finding that trial counsel made a strategic decision not to use the statements because Hammer's responses were found to be deceptive and, therefore, would "lend credence" to Hammer's trial testimony. As it explained:

Counsel testified that he was reticent to raise the substance of Hammer's interview with state police, because he was concerned that Hammer's failure of the polygraph relative to a different version of the events would lend credence to Hammer's trial version of the events.

Sattazahn, 952 A.2d at 662 (citation omitted). The Pennsylvania Supreme Court further noted that Sattazahn had not acknowledged this material testimony and, as a result, "failed to meet his burden . . . of establishing that counsel lacked a reasonable basis supporting his actions." Id. Moreover, the court found that counsel's failure to cross-examine Hammer using the actual results of the polygraph test was reasonable "in light of the federal authority" supporting the exclusion of polygraph evidence due to its inherent unreliability. See id. at 663 (citing United States v. Scheffer, 523 U.S. 303, 310-12 (1998) (additional citation omitted)).

The Magistrate Judge recommends that the Pennsylvania Supreme Court reasonably rejected Sattazahn's ineffective assistance claim both because counsel made a strategic decision to forego impeaching Hammer with his statements in the police examination and because Sattazahn established no prejudice stemming from counsel's actions.

Sattazahn argues in his Objections that the Magistrate Judge improperly deferred to the Pennsylvania Supreme Court's unreasonable determination of fact that counsel made a strategic decision not to use Hammer's statements from the police examination that were subject to a polygraph. Sattazahn further argues that the Magistrate Judge erred in recommending that no prejudice had resulted from trial counsel's failure to impeach Hammer with his statements during the polygraph.

*i.     Strategic Decision*

Sattazahn argues that the Pennsylvania Supreme Court's factual finding that trial counsel had made a strategic decision not to use Hammer's statements was unreasonable because the court did not consider the entire record. See Simmons v. Beard, 590 F.3d 223, 237 (3d Cir. 2009) ("A state court's fact-finding may qualify as unreasonable where 'the state court . . . apparently ignored,' evidence supporting the habeas petitioner's claim." (quoting Miller–El v. Cockrell, 537 U.S. 322, 346 (2003))). In Sattazahn's view, the record does not support a conclusion that trial counsel made a strategic decision not to impeach Hammer with his statements during the police examination—specifically, Hammer's statements that he did not help anyone shoot Boyer, did not know where the gun was that was used to shoot Boyer, and was not physically present when Boyer was shot.[4] Sattazahn reasons that counsel could have confronted Hammer with these inconsistent statements at trial without making any reference to the polygraph results and he points out that, when counsel was asked at the PCRA hearing why he did not use the statements without reference to the polygraph, counsel replied only that he could not recall. (N.T. 11/22/04, Docket No. 16-19,

---

[4] Hammer's statement during the police examination that he did not shoot Boyer was consistent with his testimony at Sattazahn's trial. Thus, trial counsel was unable to use this statement for impeachment purposes.

at 214-16.)    Moreover, Sattazahn argues that when counsel was asked why he did not use the polygraph results themselves, he did not testify that he was reticent to do so because of his concern with the content of the results, but rather stated only that he would have used the results if he thought that they were admissible.  (Id. at 215, 235-36.)  Thus, Sattazahn argues, the Pennsylvania Supreme Court made an unreasonable determination of fact that counsel made a strategic decision not to use Hammer's statements from the police examination out of his concern regarding Hammer's failure of the polygraph.

"[U]nder 28 U.S.C. § 2254(d)(2), a state court decision is based on an 'unreasonable determination of the facts' if the state court's factual findings are 'objectively unreasonable in light of the evidence presented in the state-court proceeding,' which requires review of whether there was sufficient evidence to support the state court's factual findings."  Dennis, 834 F.3d at 281 (citing Miller-El, 537 U.S. at 340).   "We may not characterize these state-court factual determinations as unreasonable 'merely because [we] would have reached a different conclusion in the first instance.'"  Brumfield v. Cain, 576 U.S. 305, 313-14 (2015) (alteration in original) (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)).  Therefore, "if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the [state] court's determination.'"  Wood, 558 U.S at 301 (first alteration in original) (quoting Rice v. Collins, 546 U.S. 333, 341-42 (2006)).

Accordingly, in addressing Sattazahn's arguments in this regard, we need only determine whether the record provides sufficient evidence to support the Supreme Court's finding that counsel made a strategic decision not to impeach Hammer using his inconsistent statements from the police examination.  See Dennis, 834 F.3d at 281 (citing Miller-El, 537 U.S. at 340).  In doing so, we note that Sattazahn fails to acknowledge and address the critical fact that trial counsel

testified at the PCRA hearing that using Hammer's answers to questions during the police examination for impeachment presented a "double edge sword" because "[i]f [he] would have . . . put evidence in front of the jury that [Hammer] lied to the questions [during the police examination] . . . [he] would have then been putting in front of the jury that [Hammer] is now telling the truth because his answers at trial were different from [the responses during the police examination]." (See N.T. 11/22/04, Docket No. 16-19, at 217.) Indeed, it seems plain that raising Hammer's prior inconsistent statements during the police examination that he did not help anyone shoot Boyer, did not know where the gun was, and was not present at the shooting would only lend credibility to his subsequent testimony, which was a confession to his involvement and was fully supported by the physical evidence. Moreover, while trial counsel initially testified that he could not recall why he did not use Hammer's statements during the police examination, we cannot conclude the Pennsylvania Supreme Court was unreasonable in crediting his subsequent testimony that he made a strategic decision not to impeach Hammer with his deceptive responses because such impeachment would suggest that Hammer was telling the truth at trial. (Id. at 222, 235-36.)

In sum, considering trial counsel's testimony in its entirety and affording counsel "the benefit of the doubt," Woods, 136 S. Ct. at 1151, we can only conclude that it was not "objectively unreasonable in light of the evidence presented," Dennis, 834 F.3d at 281 (citation omitted), for the Pennsylvania Supreme Court to determine that counsel had sound strategic reasons for not questioning Hammer about his prior statements to police, and, thus, his performance was not deficient under Strickland.

ii. *Actual Prejudice*

Furthermore, even assuming *arguendo* that trial counsel's performance was deficient, i.e., that he had no strategic reason for failing to impeach Hammer with his statements from the police

examination, Sattazahn still bears the burden of showing actual prejudice resulting from trial counsel's failure to impeach Hammer with his deceptive responses.  See Strickland, 466 U.S. at 694.  In other words, Sattazahn must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id.  Sattazahn contends that, contrary to trial counsel's belief, Hammer's deceptive responses were admissible, he was permitted to impeach Hammer using the responses under the Confrontation Clause, and that if the jury had heard Hammer's deceptive statements, it would have undermined Hammer's entire testimony and led to a reasonable probability that the jury would not have convicted Sattazahn.

However, for the reasons described above, Hammer's trial testimony was corroborated by physical and circumstantial evidence, including the misplaced bag that contained the murder weapon registered to Sattazahn.  Furthermore, as discussed above, the impeachment evidence could have led the jury to have more confidence in the credibility of Hammer's trial testimony, which clearly implicated Sattazahn as Boyer's murderer.  Therefore, it was objectively reasonable for the Pennsylvania Supreme Court to conclude that confronting Hammer with the deceptive statements during the police examination would not present a reasonable probability that the result of Sattazahn's trial would have been different.  See id.  Accordingly, we overrule Sattazahn's objection to this aspect of the Magistrate Judge's recommendation.

3.      *Counsel's Failure to Use Additional Impeachment Evidence*

Sattazahn also maintains that trial counsel was ineffective for failing to use additional impeachment evidence in questioning Hammer, including (1) a Schuylkill County court order directing Hammer to continue to cooperate with authorities in any case against Sattazahn; (2) Hammer's modified plea agreement in a case in Lebanon County that showed more charges

against him were dropped; (3) Hammer's preliminary hearing testimony in Schuylkill County, in which he agreed that the Schuylkill County police told him they would do whatever they could for him; and (4) Hammer's testimony in the Schuylkill County trial in which he again acknowledged that at a police officer had said that he would see what he could do in Hammer's pending cases. The Pennsylvania Supreme Court denied Sattazahn's claims that relied on this evidence, noting that counsel "established powerful motivation on the part of Hammer to curry favor with authorities, in the form of his exposure to capital punishment or sentences aggregating up to 240 years on a host of criminal charges, and his entry into a plea bargain centered on his cooperation in the prosecution of [Sattazahn]." Sattazahn, 952 A.2d at 665 (citation omitted). Therefore, the court held, Sattazahn failed to show the "potential impact of the additional impeachment evidence" and, thus, "failed to establish the requisite prejudice" necessary under Strickland. Id. at 664-66. Sattazahn objects to the Magistrate Judge's recommendation that the Pennsylvania Supreme Court reasonably denied this claim.

    As noted above, the petitioner bears the burden of showing counsel's performance was not only deficient, but that counsel's deficient performance resulted in actual prejudice. Strickland, 466 U.S. at 687-88. At Sattazahn's trial, counsel elicited Hammer's concession that although he was facing the death penalty (or up to 240 years' imprisonment), he instead received a plea bargain "for 19 to 55 years" in return for his testimony, and an agreement that "every sentence would be run at the same time," which is "much better than the death penalty." (N.T. 1/20/99, Docket No. 16-8, at 313-14, 330-31, 343.) Further, Hammer admitted that his "plea bargain [was] centered on the fact that . . . [he] would testify and tell [his] story against David Sattazahn." (Id. at 331.) In cross-examining Hammer, trial counsel stressed Hammer's deal with the Commonwealth in exchange for his testimony. (See id. at 327-33; 338-46.)

Given the above testimony that Sattazahn's counsel elicited from Hammer at trial, we conclude that the Pennsylvania Supreme Court reasonably found that Sattazahn had not carried his burden of showing actual prejudice resulting from trial counsel's failure to introduce additional impeachment evidence. See United States v. Walker, 657 F.3d 160, 186 (3d Cir. 2011) (noting "this avenue of impeachment does not provide a 'reasonable probability' of a different outcome" because "[the witness] was already impeached . . . with respect to his self-interested motivation in agreeing to testify against defendants"); United States v. Piper, 525 F. App'x 205, 209 (3d Cir. 2013) (finding "Defendant has not shown this evidence would probably have changed the outcome" because "[the witness] was already impeached for her motivation in testifying, including her expectation that her cooperation would lead to a reduced state court penalty"). Accordingly, we overrule Sattazahn's objection to the Magistrate Judge's recommendation that we deny Sattazahn relief on his ineffectiveness assistance of counsel claim pertaining to counsel's failure to impeach Hammer with additional impeachment evidence.

D.  Cumulative Error Claim

Sattazahn's Amended Petition also contends that the cumulative effects of his Brady and ineffective assistance claims warrant relief. The Pennsylvania Supreme Court denied Sattazahn's cumulative error claim because it found that his underlying claims lacked merit and, therefore, "there [was] no basis for an accumulation claim." Sattazahn, 952 A.2d at 670-71. The Magistrate Judge recommends that the Pennsylvania Supreme Court's denial was reasonable. Sattazahn objects to this recommendation, arguing that the Magistrate Judge incorrectly found that there were no errors and erroneously deferred to the Pennsylvania Supreme Court.

Individual errors that "do not warrant habeas relief may do so when combined." Albrecht v. Horn, 485 F.3d 103, 139 (3d Cir. 2007) (citing Marshall v. Hendricks, 307 F.3d 36, 94

(3d Cir. 2002)). "'[A] cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'" Id. (quoting Darks v. Mullin, 327 F.3d 1001, 1018 (10th Cir. 2003)). Cumulative errors warrant habeas relief if the petitioner has established that the errors "had a substantial and injurious effect or influence in determining the jury's verdict." Id. (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)). In other words, the petitioner must establish "'actual prejudice.'" Id. (quoting Brecht, 507 U.S. at 637). However, "[t]he cumulative effect of a series of non-errors . . . is nothing." Bueno v. Overmyer, Civ. A. No. 16-4468, 2019 WL 5686185, at *16 (E.D. Pa. Aug. 26, 2019), report and recommendation adopted, 2019 WL 5687778 (E.D. Pa. Oct. 31, 2019).

As discussed above, Sattazahn has failed to establish any "errors that individually have been found to be harmless." Albrecht, 485 F.3d at 139 (quotation omitted). Therefore, there are no errors for us to aggregate or analyze for cumulative effect. Id. As a result, Sattazahn is unable to establish actual prejudice resulting from the cumulative effect of any errors. See Bueno, 2019 WL 5686185, at *16. Accordingly, we overrule Sattazahn's objection to the Magistrate Judge's recommendation that we deny his cumulative error claim.

E.     The Magistrate Judge's Order Denying Discovery

Last, Sattazahn objects to the Magistrate Judge's Order denying his request for discovery of twenty-eight pages of the Commonwealth's notes.

1.     *Standard of Review*

"Federal Rule of Civil Procedure 72 governs objections to magistrate judges' orders, both dispositive and non-dispositive." Saudi v. Acomarit Maritmes Servs., S.A.D., Civ. A. No. 01-

4301, 2002 WL 1373077, at *1 (E.D. Pa. June 24, 2002). Pursuant to Rule 72, "[w]hen a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide, the magistrate judge must promptly conduct the required proceedings and, when appropriate, issue a written order stating the decision." Fed. R. Civ. P. 72(a). "A discovery order is considered non-dispositive because it does not dispose of a party's claim or defense." Saudi, 2002 WL 1373077, at *1 (citing Haines v. Ligget Group, Inc., 975 F.2d 81, 92 (3d Cir. 1992)). We will modify or set aside a non-dispositive order issued by a magistrate judge only if it is found to be "clearly erroneous or . . . contrary to law." Fed. R. Civ. P. 72(a).

2.    *The Magistrate Judge's Order*

The Magistrate Judge's November 27, 2019 Order noted that "[a] habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of course." Swainson v. Walsh, Civ. A. No. 12-165, 2014 WL 3508642, at *9 (E.D. Pa. July 16, 2014) (quoting Bracy v. Gramley, 520 U.S. 899, 904 (1997)). However, pursuant to Rule 6 of the Rules Governing § 2254 Cases in the United States District Courts, "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." Rules Governing § 2254 Cases, Rule 6(a). The petitioner bears the burden of "demonstrat[ing] that the sought-after information is pertinent and that there is good cause for its production." Williams v. Beard, 637 F.3d 195, 209 (3d Cir. 2011) (citations omitted). Good cause is shown "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'" Bracy, 520 U.S. at 908-09 (quoting Harris v. Nelson, 394 U.S. 286, 300 (1969)). However, a request for discovery may not amount to a fishing expedition. Williams, 637 F.3d at 210.

The Magistrate Judge denied Sattazahn's request for discovery, concluding that he had not met his burden of demonstrating that the remaining notes are "pertinent and that there is good cause for its production." Id. at 209. As the Magistrate Judge noted in her Order, the PCRA reviewed the twenty-eight pages Sattazahn now seeks, but denied his request because it found that every page but one was protected under the work product doctrine. The Magistrate Judge further found that Sattazahn presented no reason to "disbelieve the PCRA court." Id. at 210 ("[The petitioner] now essentially asks that we disbelieve the PCRA court, yet he presents us with no fact-based reason to do so.") We therefore find that the Magistrate Judge's Order is not clearly erroneous or contrary to law. See Fed. R. Civ. P. 72(a). Accordingly, we will not modify or set aside the November 27, 2019 Order denying Sattazahn's motion for discovery.

IV.     **CONCLUSION**

For all of these reasons, we find that none of Sattazahn's Objections has merit. Consequently, we overrule Sattazahn's Objections, approve and adopt the Magistrate Judge's Report and Recommendation, deny the habeas petition, and deny Sattazahn's request that we set aside the Magistrate Judge's denial of his motion for discovery. An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova
John R. Padova, J.